Andrew J. Obergfell
Bursor & Fisher, P.A.
1330 Avenue of the Americas, Fl. 32
New York, NY 10019
Tel: 646-837-7150
Email: aobergfell@bursor.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANTHONY ANGELO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DELAWARE LIFE INSURANCE COMPANY<br><br>Defendant. | Civil Action No.: 3:26-cv-14837<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Anthony Angelo ("Plaintiff"), residing at 59 Zeeland Drive, Toms River, New Jersey 08757, on behalf of himself and all others similarly situated, on personal knowledge as to the facts concerning himself, on information and belief as to all other matters, and based on the investigation of counsel and public statements, brings this class action lawsuit against Defendant Delaware Life Insurance Company ("Defendant" or "Delaware Life"), principal place of business 10555 Group 1001 Way, Zionsville, IN 46077, and alleges as follows:

## NATURE OF THE ACTION

1. This is a class action lawsuit on behalf of all persons and entities that purchased or exchanged into fixed annuities and/or fixed-index annuities from Defendant during the time period that Defendant made material misrepresentations and omissions by significantly understating the concentration of its related-party investments to both regulators and consumers. During the relevant period, Defendant repeatedly represented that its concentration of related-

party investments was approximately 3%, when in fact it was approximately 42%. These misrepresentations and omissions were material to consumers (like Plaintiff) because Defendant's concentration of related-party investments impacts its financial strength and ability to pay claims. Plaintiff and class members paid significantly more in premiums than they should have, made concessions on terms such as interest and returns because of their belief in the robust claims-paying ability of Defendant, paid surrender charges and other fees from prior annuities to exchange into Defendant's annuities, and became trapped in Defendant's own web of surrender charges and penalties such that they cannot easily unwind the transaction.

2. Delaware Life is an insurance company that provides both life insurance and annuity products, the latter of which are relevant to this case.

3. An annuity is an insurance product. Specifically, annuities are contracts between the purchaser and the insurance company wherein the purchaser pays a premium (i.e. a lump sum) up front or over a set time period, and the insurer promises to pay steady income, either immediately or in the future, often long after the actual value of the annuity is exhausted.

4. Annuity products such as the ones at issue in this case are not federally insured (i.e. through the FDIC)[1], which is to say that when a purchaser buys an annuity, they are accepting counterparty risk in the form of the insurance company's solvency and the ability to pay claims.

5. Annuity providers have stringent disclosure requirements mandated by state law. Each state, including New Jersey, has specific laws for annuity providers designed to protect consumers in annuity transactions from, among other things, misleading or fraudulent marketing. This is in recognition of the fact that there is an asymmetry of information between the insurance

[1] To be sure, there are state law protections. *See, e.g.*, N.J.S.A. 17B:32A-1, *et seq*.

company and the consumer, with the consumer relying on the insurance company truthfully reporting on its investments, claims-paying ability, and features.

6. Among the disclosures required of annuity providers are requirements to disclose related-party transactions, which are transactions either directly with affiliated entities or any financial deals, agreements, or asset transfers made between the annuity provider and an entity or individual with whom it has a preexisting business or control relationship. Insurers must truthfully disclose their concentration of related party exposure because it is germane to its ability to pay claims. Insurers with greater concentrations of related party investments are riskier than those with less concentration of related party investments.

7. Major rating agencies, such as AM Best, Standard & Poor's ("S&P Global"), Moody's Investor Services, and Fitch Ratings evaluate the financial stability of insurance companies to determine the financial strength of the insurer, which helps to provide consumer transparency as to risks (including concentration and default risk).

8. However, for a consumer (or a consumer in consultation with their financial advisor) or a rating agency to properly analyze risk in entering an annuity contract with an insurer, the insurer's disclosures must be accurate (and not misrepresented or fraudulent). Here, that was not the case, as Delaware Life significantly understated its exposure to related-party investments.

9. Delaware Life fraudulently misrepresented and/or materially omitted the true concentration of related-party investments backing annuities it issued to Plaintiff and class members. Specifically, from at least January 1, 2024 through June 26, 2026, Delaware Life represented that its exposure to related-party investments was a mere 3% when in fact it was approximately 42%. To put this in monetary terms, Delaware Life originally reported about $1.4 billion in related-party investments during the relevant time period and restated the related-party

investments as part of its audited and restated 2025 financial disclosures to over $17 billion, approximately 42% of total invested assets. As a point of reference, Delaware Life's total capital and surplus was a mere $4 billion (i.e. the buffer to absorb unexpected losses).

10. This severe understatement of related-party investment exposure was not an accident. Rather, it was part of a scheme to misrepresent the allocation of assets in entities affiliated with or controlled by Mark Walter, Delaware Life's controlling owner, as set forth below.

11. Mr. Walter is CEO and co-founder of Guggenheim Partners, LLC ("Guggenheim"), which serves as an asset manager for Delaware Life and where a large portion of Delaware Life's capital and debt investments have been allocated. Mr. Walter is also the CEO and Co-Chairman of TWG Global Holdings, LLC ("TWG"). Upon information and belief, Walter owns TWG through two holding companies. TWG predominantly owns TWG Financial Holdings, LLC, which owns 100% of Group 1001, Inc., which owns 100% of Group 1001 Insurance Holdings, LLC. Mark R. Walter is the ultimate controlling person of the Group 1001 insurance holding company system, of which Delaware Life is a member. Mr. Walter holds all voting interests in the holding companies at the top of the chain, which in turn control TWG Global Holdings, LLC, TWG Global, LLC, and TWG Financial Holdings, LLC. TWG Financial Holdings owns approximately 91.89% of Group 1001, Inc., which wholly owns Group 1001 Insurance Holdings, LLC, which, through intermediate subsidiaries ending in DLIC Sub-Holdings, LLC, wholly owns Delaware Life.[2]

[2] Mr. Walter and the various entities controlled by Mr. Walter are not named as defendants, but may be depending on information uncovered through discovery.

12. Delaware Life knowingly allocated a substantial portion of its assets to related-party investments tied to Mark Walter's various business interests, while misrepresenting the nature of the transactions to purchasers of Delaware Life annuities.

13. Importantly, Delaware Life did not identify and correct this issue on its own volition; instead, the correction followed federal grand jury subpoenas issued in February 2026 in connection with an investigation by the U.S. Attorney's Office for the Southern District of New York.

14. Plaintiff, on behalf of himself and all other similarly situated, brings claims for fraud, negligent misrepresentation, violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*. ("NJCFA"), breach of the implied covenant of good faith and fair dealing, fraud in the inducement, and unjust enrichment.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.

16. This Court has personal jurisdiction over Defendant because Defendant transacted significant business in this District, directed annuity solicitations and marketing materials relating to its annuity products into to this District (including to Plaintiff via his financial advisor), contracted to sell and provide annuity products to individuals in New Jersey (including Plaintiff), committed tortious acts within New Jersey (as set forth herein). Defendant's forum-based conduct included the solicitation, processing, issuance, and delivery of the TruePath Income 10 ™ annuity to Plaintiff while he resided in New Jersey, and Defendant's tortious conduct was directed at and caused injury to Plaintiff in this District.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant does business throughout this District, and because Plaintiff resides in this District and purchased the annuity at issue while residing in this District. Therefore, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

18. Plaintiff Anthony Angelo is a resident of Toms River, New Jersey, and resided in Toms River, New Jersey at the time of his purchase of a Delaware Life TruePath Income 10 ™ annuity in or about October 2025. Mr. Angelo purchased a Delaware Life TruePath Income 10™ annuity in October 2025. Mr. Angelo paid the premium both through surrendering and exchanging another annuity and making a payment in cash in the total amount of $278,161.57 ($250,736.06 from surrender of the prior annuity and $27,425.51 in cash). Mr. Angelo paid a withdrawal fee and negative market value adjustment from his prior annuity to purchase the Delaware Life annuity in the total amount of $33,155.35. He also entered a new surrender charge period in connection with the Delaware Life annuity, beginning at 10% in year one of the annuity and decreasing 1% each year for ten years. Mr. Angelo undertook this transaction in reliance on Delaware Life's representations and guarantees, including that the Company's guarantees were "based on the claims-paying ability and financial strength of Delaware Life Insurance Company." If Mr. Angelo had known the truth regarding Delaware Life's affiliated investments, he would not have agreed to purchase the Delaware Life annuity; at minimum, he would not have agreed to purchase the annuity on the same terms. Indeed, in the illustrations provided to Mr. Angelo, under the minimum guaranteed values illustration, Mr. Angelo's account value (and surrender value and death benefit) all go to zero in year fourteen, when Mr. Angelo is 81 years of age, at which point the yearly benefit is payable from Delaware Life's

general assets. This means that Plaintiff is directly relying on Defendant's ability to pay his yearly benefit solely through its general assets.

19. Defendant Delaware Life Insurance Company is a Delaware corporation with its principal place of business at 10555 Group 1001 Way, Zionsville, Indiana 46077. Delaware Life issues annuity contracts to consumers. Delaware Life held approximately $69 billion in assets as of March 2026, and approximately $70.5 billion in assets under management as of June 30, 2026. Delaware Life's assets support approximately 380,000 annuity and life insurance policies. Delaware Life has reported capital and surplus of approximately $4.0 billion. As set forth above, Delaware Life is controlled by Mr. Walter.

## FACTUAL ALLEGATIONS

### A. Background on Annuities and the Annuities at Issue in This Case

20. An annuity is a contract between a purchaser and an insurance company. The purchaser pays the insurer money in the form of a premium (either in a single lump sum or over time), and in exchange the insurer promises to make payments back to the purchaser (or a named beneficiary) at a later date, often for the remainder of the purchaser's life.

21. Annuities are sold principally to people who are planning for or are already in retirement. Their central selling point is security: the insurer, not the purchaser, bears the risk that the purchaser will outlive his or her savings or that financial markets will decline.

22. Annuities come in several forms. Relevant to this case are fixed and fixed index annuities. In a fixed annuity, including a multi-year guaranteed annuity, the insurer credits a stated rate of interest for a set period to the customer's account. In a fixed indexed annuity, the insurer credits interest by reference to the performance of a market index, subject to caps, participation rates, and a guaranteed floor. Many annuities can be paired with optional riders, such as guaranteed lifetime withdrawal benefits, that promise a minimum stream of income

regardless of how the contract's account value performs. That is, annuity benefits are payable to the insured from the insurer's general assets even if the account value is substantially diminished or even completely exhausted.

23. For fixed and fixed index annuities, the premium a purchaser pays becomes part of the insurer's general account. The purchaser does not own any particular asset. The purchaser instead holds a contractual claim against the insurer that is payable from the general pool of assets the insurer chooses to invest in. Guaranteed living-benefit and death-benefit riders are likewise obligations of the insurer's general account.

24. As a result, an annuity owner is in economic substance a long-term, unsecured creditor of the insurer. Whether the promised income will be paid five, ten, fifteen, or thirty years later depends on the quality, diversification, and independence of the investments the insurer holds in its general account.

25. Annuities are also long-term, illiquid commitments. Most deferred annuities impose surrender charges, frequently lasting seven to ten years, on any withdrawal above a limited free-withdrawal amount. Many also apply a market value adjustment that can further reduce the amount a purchaser receives on early withdrawal or surrender.

26. Annuity purchasers have no practical ability to audit an insurer's investment portfolio. They necessarily rely on the insurer's own statements about its financial strength, on the statutory financial statements the insurer files with state regulators, and on financial strength ratings issued by rating agencies that themselves rely on the insurer's reported figures.

27. The annuities at issue in this case are fixed annuities and fixed index annuities offered by Delaware Life (as said annuities are directly tied to Delaware Life's solvency and ability to pay claims). These include, but are not limited to, TruePath Income, TrackGuard+, Growth Pathway, Momentum Growth, and Momentum Growth Plus.

**B. All States, Including New Jersey, Provide Robust Protections for Annuity Holders**

28. Because annuity owners cannot see inside the insurer that owes them money, every state (including New Jersey) has built a regulatory framework around the insurer's duty to tell the truth about its finances. That framework rests on model laws and accounting standards developed by the National Association of Insurance Commissioners ("NAIC") and adopted, in substantially similar form, throughout the country.

29. Every state has enacted a version of the NAIC Unfair Trade Practices Act. In New Jersey, the Life and Health Insurance Trade Practices law, N.J.S.A. 17B:30-1 *et seq*., forbids any person from engaging in an unfair or deceptive act or practice in the business of life insurance or annuities. N.J.S.A. 17B:30-2. This includes a prohibition on misrepresentations and false advertising of annuity contracts. N.J.S.A. 17B:30-3. Specifically, N.J.S.A. 17B:30-3 states: "No person shall . . . make any misleading representation or any misrepresentation as to the financial condition of any insurer[.]" N.J.S.A. § 17B:30-3. Also relevant is N.J.S.A. § 17B:30-5, which states: "No person shall file with any supervisory or other public official, or make, publish, disseminate, circulate or deliver to any person, or place before the public, or cause directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false statement of financial condition of an insurer with intent to deceive."

30. New Jersey law also requires an insurer selling an annuity directly to a consumer to provide the purchaser with a Buyer's Guide and a disclosure statement describing the contract's features, fees, and surrender charges, and gives annuity purchasers a free-look period of at least ten days in which to return the contract for a full refund of premium for any reason. N.J.S.A. § 17B:25-37; N.J.A.C. 11:4–59.3-11:4–59.4.[3]

[3] *See also* https://www.nj.gov/dobi/pressreleases/pr170405.html (last visited 10/30/26).

31. Under N.J.A.C. 11:4–59A.3, an insurer and its producers may recommend an annuity only after gathering the consumer's financial profile, considering the product's features and risks, and ensuring that the consumer is reasonably informed about the annuity. Specifically, the law notes that the "characteristics of the insurer, and product costs, rates, benefits, and features are those factors generally relevant in making a determination whether an annuity effectively addresses the consumer's financial situation[.]" *Id.*

32. Plaintiff cites these requirements as evidence of the standard of conduct that applies to Delaware Life and of what New Jersey regards as material to an annuity purchaser, not as an independent cause of action.

33. Every insurer licensed in New Jersey (or any other state) must file sworn annual and quarterly statutory financial statements with its domiciliary regulator and with the NAIC, prepared in accordance with the NAIC's Accounting Practices and Procedures Manual. Those statements are the primary source from which regulators, rating agencies, distributors, and the public assess an insurer's solvency and claims-paying ability. The statutory statement forms require an insurer to identify, among other things, its investments in and transactions with affiliates and related parties. This is a recognition that concentration of investments with affiliates and related parties is material to both regulators and consumers. Each statutory statement is signed and sworn by the insurer's senior officers, who attest that the statement is a full and true account of the insurer's assets, liabilities, and condition.

34. Every state (and the District of Columbia), including New Jersey, has adopted a version of the NAIC Insurance Holding Company System Regulatory Act. Delaware, where Delaware Life is incorporated, requires that transactions between a Delaware insurer and members of its holding company system be on fair and reasonable terms, and requires advance notice to, and non-disapproval by, the Delaware Insurance Commissioner before an insurer can

enter a material affiliate transaction. 18 Del. C. § 5005. New Jersey's counterpart is the Insurance Holding Company Systems Act, N.J.S.A. 17:27A-1 *et seq.*

35. The purpose of these holding-company rules is to prevent a controlling owner from using an insurer's policyholder-backed assets to finance the owner's other businesses on terms the insurer would not accept from a stranger. They work only if the insurer correctly identifies which of its investments are, in substance, affiliated.

36. Taken together, these laws reflect a consistent judgment by New Jersey and every other state: an annuity purchaser is entitled to accurate information about the financial condition of the insurer, including the extent to which its assets are tied up in investments with its own controlling owner, because that information bears directly on what the appropriate terms of the transaction should be (i.e. premium, interest, etc.) and, more fundamentally, whether the purchaser's long-term income will be paid.

**C. Defendant Intentionally Misrepresented and Materially Omitted Its True Concentration of Related-Party Investments While Promoting Its Financial Strength**

37. In its marketing materials, contracts, and other consumer-facing documents, Delaware Life emphasizes its financial strength. For example, in the True Path Income™ brochure, Delaware Life states: "At Delaware Life, we provide insurance to protect what is often your second biggest asset—your retirement savings."[4] From the very beginning of the brochure, Delaware Life emphasis that investing in its True Path Income™ annuity provides meaningful protection for retirement savings. The brochure continues with similar assurances, including that "TruePath Income™ fixed index annuity is an insurance product that is designed to help you meet your long-term retirement needs[]" and that "TruePath Income™ also includes a built-in Guaranteed Lifetime Withdrawal Benefit (GLWB) rider, which guarantees you (or you and your

[4] https://www.delawarelife.com/product/truepath-income (last visited 11/4/26).

spouse) will receive retirement income payments for life, even if the contract value drops to zero[.]" These promises emphasize long-term security and guaranteed income backed by Delaware Life's assets (i.e. "even if the contract value drops to zero"). Similar representations are repeated throughout the brochure, for example: "If your account value declines or reduces to zero, your income payments will continue for the remainder of your life or your life and your spouse's life if you elected joint life coverage."

38. In the same brochure, Delaware Life emphasizes its trustworthiness and the security of entrusting money to Delaware Life. For example, Delaware Life states: "Delaware Life has decades of annuity innovations and brings you a long history and solid track record. This includes developing competitive products, delivering a seamless, efficient experience, and serving as an honest and reliable financial institution." Delaware Life further emphasized its ratings from A.M. Best, S&P, and Fitch, stating to consumers: "Established in 1971, and rebranded as Delaware Life in 2013, we have a strong balance sheet and a highly talented and experienced employee base with the deep annuity and asset management expertise to proudly serve you and your clients and honor all the company's policyholder commitments."

39. Despite these representations, Delaware Life was secretly concentrating large portions of its assets into affiliated investments while misrepresenting the same to consumers.

40. Further, Delaware Life's marketing and contract materials tell purchasers that the guarantees they are buying depend on Delaware Life's financial strength and claims-paying ability, and its sales materials prominently display its financial strength ratings.

41. This is true in Plaintiff's case. In the illustrations provided by Delaware Life to Plaintiff, Delaware Life stated that the Company's "guarantees [. . .] are based on the claims-paying ability and financial strength of Delaware Life Insurance Company."

42. Delaware Life knew that its financial strength depended on the composition of its general account and that purchasers, distributors, and rating agencies would evaluate that composition through its statutory filings. Prior to June 2026, Delaware Life uniformly represented through regulatory filings that its exposure to its own controlling owner was small, when in fact it was not.

43. For example, in its 2025 Annual Statement, Delaware Life reported that affiliated investments made up approximately 3% of its invested assets. When in fact it was approximately 42%. Delaware Life has since admitted that additional related-party investments were omitted from its 2025 Annual Statement.

44. After correcting its classifications (following a grand jury subpoena), Delaware Life restated its total investment in parents, subsidiaries, and affiliates as of December 31, 2025 to approximately $18.25 billion, or about 42% of its general account invested assets of approximately $43.88 billion. By June 2026, that number climbed to approximately $19.1 billion. In other words, Delaware Life's affiliated exposure was roughly fourteen times what it had reported. The restated figures dwarf Delaware Life's capital base of approximately $4 billion. Capital and surplus is the cushion that absorbs investment losses before policyholder obligations are put at risk.

45. Most of Delaware Life's affiliated exposure did not take the form of direct investments in affiliates. Instead, most of the concealed related-party exposure consisted of private credit investments made to counterparties whose investment return Delaware Life now concedes is "predominantly contingent on the performance of affiliates." The carrying value of those investments was approximately $16.37 billion as of December 31, 2025.

46. Delaware Life also disclosed two further categories of affiliate-dependent investments: (a) investments with counterparties that used the proceeds to buy separate account

funding agreements whose supporting assets depend predominantly on affiliates, carried at approximately $308 million; and (b) investments in trust notes whose proceeds bought general account funding agreements and a pool of private credit assets that likewise depend predominantly on affiliates, carried at approximately $326 million at year-end 2025 and approximately $513 million at March 31, 2026.

47. Structuring the exposure through nominally independent counterparties allowed Delaware Life to present a portfolio that appeared diversified on the face of its filings, while in economic substance billions of dollars of policyholder-backing assets depended on the fortunes of businesses owned or controlled by its ultimate controlling person, Mark Walter, and by TWG, the holding company through which he controls Delaware Life.

48. Delaware Life has stated that the federal investigation concerns whether certain private credit investments "introduced to" Delaware Life "by an affiliate" should have been treated as affiliated or related-party transactions. Delaware Life therefore knew that an affiliate had originated or brought it certain of the investments at issue, and therefore knew or should have known that its own controlling owner's businesses stood behind them, yet it reported them as unaffiliated.

49. Further, Delaware Life's 2025 Annual Statement was signed and notarized on February 18, 2026, and its audited statement from June 2026 states: "In February 2026, [Delaware Life . . .] received [a] grand jury subpoena[] in connection with an investigation being conducted by the U.S. Attorney's Office for the Southern District of New York." It is therefore possible, if not likely, that Delaware Life filed its original 2025 Annual Statement knowing of the grand jury subpoena, and nevertheless filed an Annual Statement reporting affiliated investments of approximately 3% after it had been subpoenaed by federal prosecutors investigating precisely that classification.

50. Delaware Life did not disclose the subpoena, the investigation, or the misclassification until June 26, 2026. Nevertheless, Delaware Life continued selling annuities throughout the first quarter of 2026, and collected approximately $2.40 billion in direct individual annuity considerations, roughly 67% more than in the first quarter of 2025, including approximately $72.86 million from New Jersey. Delaware Life continued to tell prospective purchasers that their guarantees were backed by its financial strength and claims-paying ability and continued to display financial strength ratings that rating agencies had assigned in reliance on its inaccurate statutory filings. It said nothing about the subpoena, the investigation, or the fact that approximately four of every ten dollars in its general account depended on its controlling owner's businesses.

51. Delaware Life has admitted that it "did not identify the misclassification issue on a timely basis" and that "deficiencies existed in [its] internal control over financial reporting." While Plaintiff alleges, on information and belief, that Delaware Life knew it was making affirmatively false and misleading representations to consumers, it has admitted that it was at least negligent, if not grossly negligent, in its misclassification of assets.

52. The true extent of Delaware Life's related-party concentration was material to any reasonable annuity purchaser. A purchaser deciding whether to commit retirement savings to a decades-long, unsecured promise from Delaware Life would want to know that roughly 40% of the assets backing that promise depended on businesses controlled by the insurer's own owner and that this exposure exceeded the insurer's capital several times over.

53. Plaintiff and members of the Classes (defined below) had no means of discovering the true concentration of Delaware Life's related-party investments on their own. Delaware Life is not a publicly traded company, and its financial condition is visible to consumers only through its statutory filings and the ratings derived from them. Those filings

understated the concentration of related-party investments significantly, and Delaware Life exclusively controlled the information needed to correct them.

**D. Delaware Life Used a Substantial Portion of Its Assets to Invest in Walter-Controlled Entities to Further His Business Empire**

54. Mark Walter is the ultimate controlling person of the Group 1001 insurance holding company system, of which Delaware Life is a member.

55. Delaware Life's regulatory filings also list many other entities that Mr. Walter ultimately controls. Beyond insurance, they span professional sports and entertainment (including TWG Sports, LLC; PWHL Holdings, LLC, which owns the Professional Women's Hockey League; Cadillac Formula 1 team entities; Andretti Global, LLC; Spire Motorsports Holdings, LLC; and a holding company for an interest in Fanatics); artificial intelligence and technology ventures; entities whose names refer to energy, education, and infrastructure projects in Brazil, Fujairah, and Puerto Rico; consumer and home-improvement finance vehicles; real estate; and private equity and private credit funds. Mr. Walter is also the chief executive of Guggenheim Partners. Upon information and belief, Mr. Walter also holds a controlling ownership interest in the Los Angeles Dodgers.

56. Many of these ventures are capital-intensive, long-horizon, and illiquid. They require large and continuing sources of financing.

57. Delaware Life became a source of that financing need. By its own restated figures, Delaware Life had approximately $18.25 billion invested in affiliates at year-end 2025 and approximately $19.80 billion at March 31, 2026. All but a small fraction of that exposure consisted of private credit whose repayment, as Delaware Life now admits, depends predominantly on the performance of businesses owned or controlled by TWG or Mr. Walter.

58. Upon information and belief, Delaware Life extended this credit through a network of special-purpose borrowers that appeared independent on paper but passed the money

on to Walter-controlled businesses. Public reporting in August 2026 stated that federal investigators were focused on four firms that acted as intermediaries for loans from Mr. Walter's insurers to other companies in his business empire: ABS Capital, Amistad Financial, Bradford Allen, and Hudson Trading.[5]

59. Delaware Life's own filings corroborate those links. Schedule Y in Delaware Life's 2025 Annual Statement lists a Walter-controlled entity named TWG Bradford Allen Fund Feeder, LLC. Delaware Life's 2026 Q1 Statement's investment schedules classify as affiliated bonds both notes issued by Amistad Debt Warehouse 1 LLC and senior secured notes issued by Dodger Tickets LLC.

60. Between January 23 and February 3, 2026, Delaware Life directly funded approximately $730 million in new notes to eleven limited liability companies with similar, generic names: Pine Avenue Capital LLC ($70.0 million); Walnut Avenue Capital LLC ($62.5 million); Willow Avenue Capital LLC ($75.0 million); Cherry Wood Avenue Capital LLC ($57.5 million); Elm Avenue Capital LLC ($55.0 million); Birch Avenue Capital LLC ($60.0 million); Bluford Financial LLC ($67.75 million); Hansberry Investors LLC ($77.5 million); Mays Capital Holdings LLC ($70.0 million); Withers Investors LLC ($72.25 million); and Bolin Capital Company LLC ($62.5 million). Each of these notes carried an interest rate between approximately 7.6% and 8.3%, a stated maturity extending into the 2030s, and the same NAIC designation, and each was acquired by "direct funding" rather than through a broker. The 2026 Q1 Statement, prepared after Delaware Life's internal investigation, classifies every one of them as an affiliated investment. Upon information and belief, these newly formed borrowers passed the proceeds to Walter-controlled businesses.

[5] *See, e.g.,* https://fortune.com/2026/08/16/fraud-investigation-mark-walter-guggenheim-partners-insurance-companies/ (last visited 11/2/26).

61. The 2026 Q1 Statement also discloses an array of other transactions between Delaware Life and members of the Walter-controlled holding company system, including: (a) reciprocal demand-loan arrangements under which affiliates, including Clear Spring, drew hundreds of millions of dollars from Delaware Life in the first quarter of 2026; (b) a $110 million demand promissory note owed by affiliate Clear Spring Health Insurance Company; (c) a $100 million capital contribution Delaware Life made toward an affiliated property-and-casualty insurer; (d) Delaware Life's March 2026 purchase of its Zionsville, Indiana office building from an affiliate for approximately $36.1 million; and (e) an investment management agreement under which Guggenheim Partners Investment Management, LLC managed approximately $2.45 billion of Delaware Life’s investments.

62. Upon information and belief, Delaware Life made the affiliate-dependent investments because they supplied Mr. Walter’s businesses with large amounts of patient capital on terms they could not readily obtain from independent lenders, and because routing the loans through nominally unaffiliated borrowers kept them outside the holding-company review and investment-concentration limits that would otherwise apply.

63. The concentration also deprived Delaware Life of the independence that annuity owners are entitled to expect from the insurer holding their savings. When roughly 40% of an insurer’s invested assets depend on its owner’s other businesses, decisions about whether to extend, restructure, enforce, or write down those loans are made by people answering to the same controlling owner who benefits from them.

64. Delaware Life has since agreed to unwind a large share of these investments with TWG. On August 17, 2026, it entered into a Purchase and Sale Agreement with TWG to exchange up to $6.5 billion of the reclassified private credit investments for non-affiliated

investments supplied by TWG, and TWG has separately agreed to buy additional reclassified investments under an Asset Purchase Agreement.

65. Delaware Life projects that even after these transactions, affiliated investments will still represent approximately 20% to 25% of its general account invested assets at year-end 2026, and that they will not fall below 10% until June 30, 2027. By comparison, Delaware Life had told regulators and the public that the figure was approximately 3%.

**E. Defendant's High Concentration of Related-Party Investments Harmed Plaintiff and Class Members**

66. Plaintiff and class members were injured at the time and point of sale of their annuities because they paid more than they should have had Delaware Life truthfully disclosed its concentration of related-party investments and the impact of the same on its claims-paying ability. That is, the annuities Plaintiff and class members purchased were worth less than the premiums they paid.

67. Plaintiff and class members undertook the transactions at issue in reliance on Delaware Life's representations and guarantees, including that its guarantees are "based on the claims-paying ability and financial strength of Delaware Life Insurance Company." Had Plaintiff and class members known the truth regarding Delaware Life's affiliated investments, they would not have agreed to purchase the Delaware Life annuities; at minimum, they would not have agreed to purchase the annuities on the same terms.

68. These concerns are not hypothetical. In many cases, as in Plaintiff's case, the actual value of the annuity is projected to decrease significantly over time, often to $0, but Delaware Life is still contractually obligated to make payments. This means that Plaintiff and class members directly rely on Delaware Life's ability to pay claims out of its general assets. Indeed, in the illustrations provided to Plaintiff by Delaware Life, under the minimum guaranteed values illustration, Plaintiff's account value (and surrender value and death benefit)

all go to zero in year fourteen, when Plaintiff is 81 years of age, at which point the yearly benefit is payable from Delaware Life's general assets.

69. Plaintiff and members of the Classes (defined below) paid premiums, and accepted the fees, surrender charges, and other terms on the understanding that Delaware Life's guarantees were backed by a general account in which only about 3% of invested assets were tied to affiliates. What they received was a promise backed by a general account in which approximately 42% of invested assets depended on businesses controlled by Delaware Life's owner. A long-term, unsecured promise from an insurer carrying that concentration of related-party investments is worth less than the same promise from an insurer whose assets are what it represented them to be. As such, Plaintiff and class members suffered economic loss.

70. The affiliate-dependent investments are privately originated, are not traded on any public market, and are difficult to value or sell quickly. Because their repayment depends predominantly on a single group of related businesses, a setback in Mr. Walter's enterprises could impair a large portion of Delaware Life's portfolio at the same time. As of March 31, 2026, those investments significantly exceeded Delaware Life's total capital and surplus.

71. Every annuity carried a free-look period during which the owner could return the contract for a full refund of premium. In New Jersey, that period is at least ten days. Delaware Life frustrated this process by failing to disclose the true concentration of its related-party investments such that the period for Plaintiff and class members to return the contract for a full premium refund expired without Plaintiff and class members being able to make a meaningful choice regarding the same.

72. Plaintiff and class members relied on Defendant's misrepresentations and omissions as set forth herein, and in doing so paid surrender charges and fees to exchange other annuities into a Delaware Life annuity, which they would not have done had they known the

truth about Delaware Life's high concentration of related party investments. For example, Plaintiff paid a withdrawal fee and negative market value adjustment from his prior annuity to purchase the Delaware Life annuity in the total amount of $33,155.35. He would not have done so but for Delaware Life's misrepresentations and omissions.

73. Outside the free-look period, an owner who wants to surrender a Delaware Life annuity must pay surrender charges that commonly run for up to ten years and may also be subject to a market value adjustment. In Plaintiff's case, in purchasing the Delaware Life annuity, Plaintiff entered a new surrender charge period beginning at 10% in year one of the annuity and decreasing 1% each year for ten years. Plaintiff would not have accepted this new surrender period had he known the truth regarding Delaware Life's assets.

74. Further, Delaware Life is holding consumers, including Plaintiff, to their annuity contracts even though Delaware Life hoodwinked Plaintiff and class members to enter them under false pretenses. On November 4, 2026, Plaintiff sent Defendant a letter demanding that Delaware Life fully refund his annuity contract without assessing surrender charges or other penalties of any kind (including but not limited to any negative Market Value Adjustment) and make Plaintiff completely whole regarding other damages sustained in connection with the purchase of the Delaware Life TruePath Income 10 ™ annuity, including reimbursing him for the surrender-related fees he incurred in surrendering his prior annuity. In a letter dated November 13, 2026, Delaware Life refused, stating: "We reviewed your concerns and have identified no contractual basis to terminate the contract without surrender charges or a market value adjustment." Therefore, Plaintiff and class members who wish to unwind their transactions must pay Delaware Life a penalty to do so, and those who have already surrendered have paid it.

75. In short, Plaintiff relied on Delaware Life's representations about its financial strength and claims-paying ability, including its disclosure of its related-party investment concentration, when purchasing/exchanging into the Delaware Life annuity. Had Plaintiff known the truth, Plaintiff would not have purchased the annuity, or would have paid less for it, or would have returned it during the free-look period.

**F. Defendant's Conduct Resulted in a Federal Grand Jury Subpoena and SEC Investigation; Revising of Ratings Outlooks; and Certain Vendors Pausing Sales of Defendant's Annuities**

76. In February 2026, Delaware Life received a grand jury subpoena issued in connection with an investigation by the U.S. Attorney's Office for the Southern District of New York. Delaware Life has stated that it understands the investigation to focus on whether private credit investments that an affiliate introduced to Delaware Life should have been treated as affiliated or related-party transactions. The SEC is conducting a parallel investigation.

77. According to public reporting, federal prosecutors and the SEC are examining whether Mr. Walter or businesses he controls committed fraud by concealing financial connections while borrowing billions of dollars from his insurers, and investigators have focused on four intermediaries through which the insurers' loans reportedly reached other Walter businesses.

78. Only after receiving the grand jury subpoena did Delaware Life begin an internal investigation of its affiliated and related-party investment disclosures. That investigation identified errors in how Delaware Life had identified and presented related-party investments in its 2025 Annual Statement.

79. Delaware Life has since adopted a Control Remediation Plan that calls for, among other things, stronger counterparty due diligence, improved related-party and affiliate reporting,

enhanced internal audit monitoring, and outside advisors to develop control practices, and it does not expect to complete that plan until it files its December 31, 2026 statutory statements.

80. Within weeks of Delaware Life's disclosures re-classifying its investments, three major rating agencies that rate Delaware Life took negative action.

81. On July 14, 2026, S&P revised its outlook on Delaware Life from stable to negative while affirming its "A-" issuer credit and financial strength ratings. S&P explained that Delaware Life had identified an internal control weakness in financial reporting and investment underwriting affecting a meaningful part of its portfolio, that the reclassification raised affiliated investments from 3% to about 42% of invested assets, and that it considered this a material part of the portfolio affecting its investment risk analysis.

82. S&P stated that it could lower Delaware Life's ratings within 12 to 18 months if, among other things, the control weakness is not fixed, higher asset charges from the portfolio restructuring push its capital below S&P's 99.95% confidence level, its investment policy becomes too aggressive, the government investigations lead to penalties or judgments that weaken its finances beyond S&P's assumptions, or its sales or operating performance decline. S&P also warned that adverse outcomes of the investigations could weaken Delaware Life's regulatory relationships and damage its reputation.

83. In July 2026, Fitch placed Delaware Life's ratings, including its "A-" insurer financial strength rating, on Rating Watch Negative, citing in part the reclassification of private credit investments as affiliated or related-party assets and related concerns about governance, financial reporting, and investment oversight.

84. Also in July 2026, AM Best affirmed Delaware Life's "A-" financial strength rating but revised its outlook from positive to negative, citing in part the reclassification of investments from unaffiliated to affiliated.

85. These actions matter to annuity owners because financial strength ratings measure the very attribute Delaware Life emphasized to sell its annuities: its ability to pay claims. Each agency revised its view only after learning what Delaware Life had not told Plaintiff and class members.

86. In late August 2026, two large regional banks that distributed Delaware Life's products through their branches and adviser networks, Truist Financial Corp. and Fifth Third Bancorp, paused distribution of products tied to Delaware Life, according to Bloomberg News.[6] According to public reporting, Fifth Third had begun doing business with Delaware Life only in April 2026.[7] That is, sophisticated distributors with their own obligations to their customers concluded that the information Delaware Life had withheld was serious enough to stop offering its products, at least temporarily.

87. Plaintiff and class members, by contrast, were never given the opportunity to make that judgment before committing their savings, because Delaware Life withheld the information they needed to make it.

88. Delaware Life and TWG have committed to move billions of dollars of affiliate-dependent assets off Delaware Life's balance sheet, including an up-to-$6.5 billion asset exchange and a further Asset Purchase Agreement, with a first tranche of approximately $3.8 billion approved by regulators on October 22, 2026. An insurer and its controlling owner do not undertake transactions of that size to correct a disclosure that is merely "technical."

89. Delaware Life's restatement, the federal investigations, the rating agencies' negative actions, the distributors' sales pauses, and Delaware Life's multibillion-dollar

[6] https://www.bloomberg.com/news/articles/2026-08-28/mark-walter-s-biggest-insurer-sees-banks-pause-sales-amid-probe (last visited 11/2/26).

[7] https://www.cnbc.com/2026/08/28/mark-walter-delaware-life-truist-fifth-third-banks.html (last visited 11/2/26).

remediation all confirm that the true concentration of its related-party investments was material to anyone deciding whether to entrust their retirement savings to Delaware Life, and that Plaintiff and the Classes (defined below) were harmed by Delaware Life's failure to disclose the same.

**G. As of November 2026, Delaware Life is Behind Schedule in Reducing Related-Party Investments**

90. On November 17, 2026, the Wall Street Journal reported that Delaware Life said it "reduced the share of its investments tied to [Mr. Walter's] own businesses last quarter less than it had targeted."[8] That is, "Delaware Life said it has exchanged around $2.7 billion in assets as of mid-November with Walter's holding company, TWG Global," which "fell short of the $6.5 billion the insurer said in September it aimed to close by mid-November." In short, Delaware Life missed its target by almost $4 billion. This underscores the danger of such a high concentration of related-party investments and why such disclosures are material to consumers.

91. The same article further revealed systemic and structural issues at Delaware Life which permitted the fraudulent and misleading activity alleged herein to occur, as the Wall Street Journal reported that Delaware Life reported "control weaknesses" and that it plans to add "new independent directors," suggesting the lack of independent directors before.

**<u>CLASS ALLEGATIONS</u>**

92. Plaintiff brings his claims individually and on behalf of the following proposed class: All persons and entities in the United States or its territories who, between January 1, 2024 and June 26, 2026, purchased or exchanged into a fixed or fixed index annuity issued by Delaware Life (the "Nationwide Class").

---

[8] https://www.wsj.com/finance/dodgers-owner-mark-walters-insurer-misses-target-to-reduce-affiliated-assets-249e32c5 (last visited 11/17/26).

93. Plaintiff also seeks to represent a New Jersey subclass defined as follows: All persons and entities in New Jersey who, between January 1, 2024 and June 26, 2026, purchased or exchanged into a fixed or fixed index annuity issued by Delaware Life (the "New Jersey Subclass").

94. The Nationwide Class and New Jersey Subclass are collectively referred to as the "Classes."

95. Excluded from the Classes are: Defendant; any of its corporate affiliates; any of its directors, officers, or employees; any person who timely elects to be excluded from the Classes; any government entities; and any judge to whom this case is assigned and their immediate family and court staff.

96. Plaintiff does not know the exact number of members in the Classes but reasonably believes that there are hundreds of thousands of members of the Classes. The members of the Classes are so numerous that joinder of all members of the Classes would be impracticable. The names and addresses of members of the Classes are identifiable through documents maintained by Defendant.

97. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) whether Defendant made material misrepresentations or omissions to purchasers of its annuities concerning its concentration of related-party investments;

(b) whether Delaware Life's representation that its exposure to related-party investments was a mere 3% when in fact it was approximately 42% was material to purchasers;

(c) whether Delaware Life represented to the Classes that its annuity obligations were backed by Delaware Life's financial strength and claims-paying ability;

(d) whether Delaware Life knew that its representations regarding its exposure to related-party investments were false;

(e) whether Delaware Life represented that approximately 3% of Delaware Life's investments were related-party investments while the actual concentration was approximately 42%;

(f) whether Plaintiff and members of the Classes were harmed by Defendant's misrepresentations and/or omissions; and

(g) whether Defendant was unjustly enriched by the alleged unlawful conduct.

98. Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendant's wrongful conduct.

99. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

100. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes.

101. Plaintiff is represented by counsel competent and experienced in complex class action litigation.

102. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

103. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit many similarly situated

persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense of numerous individual actions. The benefits of proceeding as a class, including providing injured persons with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any potential difficulties in managing this class action.

104. The prosecution of separate actions by individual members of the Classes is not feasible and would create a risk of inconsistent or varying adjudications.

## CLAIMS FOR RELIEF

### CLAIM I
**Fraud**
**(On behalf of Plaintiff and the Classes Against Defendant)**

105. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

106. Plaintiff brings this count on behalf of himself and the members of the Classes.

107. As set forth herein, Delaware Life made: 1) material misrepresentations regarding its concentration of related-party investments and claims paying ability; 2) partial disclosures regarding its concentration of related-party investments and claims paying ability which triggered a duty to disclose the full facts; and 3) material omissions regarding its concentration of related-party investments.

108. First, as to material misrepresentations, Defendant affirmatively misrepresented its concentration of related-party investments when it filed its annual reports for 2024 and 2025, intentionally misclassifying those investments as unaffiliated. Delaware Life also made misrepresentations regarding its financial strength and claims-paying ability, which were made directly to Plaintiff in the form of his illustrations (marketing materials provided to Plaintiff by Delaware Life), and through Delaware Life's brochure and marketing materials.

109. Under New Jersey law, "[p]artial disclosure may amount to fraud." *Berman v. Gurwicz*, 189 N.J. Super. 89, 93 (Ch. Div. 1981), *aff'd*, 189 N.J. Super. 49 (App. Div. 1983); *see id.* ("If in addition to the party's silence there is any statement, even any word or act on his own part, which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent."). This rule is a generally recognized principle of common law. Here, Delaware Life made partial disclosures which triggered a duty to disclose. For example, in its marketing materials, contracts, and other consumer-facing documents, Delaware Life emphasizes its financial strength. For example, in the True Path Income™ brochure, Delaware Life states: "At Delaware Life, we provide insurance to protect what is often your second biggest asset—your retirement savings."[9] From the very beginning of the brochure, Delaware Life emphasis that investing in its True Path Income™ annuity provides meaningful protection for retirement savings. The brochure continues with similar assurances, including that "TruePath Income™ fixed index annuity is an insurance product that is designed to help you meet your long-term retirement needs[]" and that "TruePath Income™ also includes a built-in Guaranteed Lifetime Withdrawal Benefit (GLWB) rider, which guarantees you (or you and your spouse) will receive retirement income payments for life, even if the contract value drops to zero (provided certain conditions are met)." These promises emphasize long-term security and guaranteed income guaranteed by Delaware Life's assets (i.e. "even if the contract value drops to zero"). Similar representations are repeated throughout the brochure, for example: "If your account value declines or reduces to zero, your income payments will continue for the remainder of your life or your life and your spouse's life if you elected joint life coverage."

[9] https://www.delawarelife.com/product/truepath-income (last visited 11/4/26).

110. In the same brochure, Delaware Life emphasizes its trustworthiness and the security of entrusting money to Delaware Life. For example, Delaware Life states: "Delaware Life has decades of annuity innovations and brings you a long history and solid track record. This includes developing competitive products, delivering a seamless, efficient experience, and serving as an honest and reliable financial institution." Delaware Life further emphasized its ratings from A.M. Best, S&P, and Fitch, stating to consumers: "Established in 1971, and rebranded as Delaware Life in 2013, we have a strong balance sheet and a highly talented and experienced employee base with the deep annuity and asset management expertise to proudly serve you and your clients and honor all the company's policyholder commitments."

111. Despite these representations, Delaware Life was secretly concentrating large portions of its assets into affiliated transactions while misrepresenting the same to consumers. Meanwhile, Delaware Life's marketing and contract materials tell purchasers that the guarantees they are buying depend on Delaware Life's financial strength and claims-paying ability, and its sales materials prominently display its financial strength ratings.

112. This is true in Plaintiff's case. In the illustrations provided by Delaware Life to Plaintiff, Delaware Life stated that the Company's "guarantees [. . .] are based on the claims-paying ability and financial strength of Delaware Life Insurance Company."

113. Delaware Life knew that its financial strength depended on the composition of its general account and that purchasers, distributors, and rating agencies would evaluate that composition through its statutory filings. Prior to June 2026, Delaware Life uniformly represented through regulatory filings that its exposure to its own controlling owner was small, when in fact it was not.

114. Delaware Life's various representations regarding its financial strength and claims-paying ability amounted to partial representations which triggered a duty to disclose. In

short, Delaware Life chose to speak about its financial strength and claims-paying ability in public documents made available to Plaintiff and class members to encourage them to purchase an annuity from Delaware Life; as such, Defendant itself made its financial strength and claims-paying ability a central foundation of every annuity it sold (including to Plaintiff), and thereby assumed a duty to speak fully and truthfully regarding its related-party investments, which it failed to do.

115. Delaware Life also omitted material facts. For example, Delaware Life materially omitted its true concentration of related-party investments by failing to disclose the same in its regulatory filings or otherwise. Delaware Life had a duty to disclose these material omissions because of the nature of the relationship between Delaware Life and Plaintiff and class members, namely the trust placed by consumers in Delaware Life's representations (as recognized in New Jersey statutes as set forth in paragraphs 28-36, above). New Jersey recognizes a duty to disclose in "situations in which 'either one or each of the parties, in entering ... [the] transaction, expressly reposes ... a trust and confidence in the other ... or [because of the] circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence ... is necessarily implied.'" *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 551 (App. Div. 1997). Here, Delaware Life is not a public company subject to reporting requirements. Instead, its true condition is discernible to consumers only through statutory filings, which as set forth herein, contained material omissions of fact. New Jersey and every other state recognizes this asymmetry of information, and that is why annuity providers are statutorily prohibited from publishing false or misleading information (*see* paragraphs 28-36, above). Annuity purchasers like Plaintiff put their trust and confidence in providers such as Delaware Life making accurate disclosures, which Delaware Life failed to do.

116. Delaware Life's misrepresentations, partial disclosures, and omissions were material to Plaintiff and class members because had Plaintiff and class members known the truth regarding Delaware Life's affiliated investments, they would not have agreed to purchase the Delaware Life annuities; at minimum, they would not have agreed to purchase the annuities on the same terms. Further, that New Jersey and other states require annuity providers like Delaware Life to disclose related-party investments to regulators (and by extension consumers and the public) underscores the materiality of the misrepresentations, partial disclosures, and omissions at issue.

117. At all times, Delaware Life had knowledge that its respective misrepresentations, partial disclosures, and omissions were false. Defendant knew its assets and the entities it was dealing with in investing those assets, knew its relationship to the parties it was dealing with, and therefore knew that it was materially misrepresenting its concentration of related-party investments. As set forth above, Delaware Life is controlled by Mark Walter and knew or should have known it was dealing with other Walter-adjacent entities in investing its assets.

118. Delaware Life intended for Plaintiff and class members to rely on its respective misrepresentations, partial disclosures, and omissions because it falsely represented its financial strength and composition of related-party investments because it wanted consumers to continue purchasing annuities based on its perceived financial strength. At all times material to this action, Delaware Life acted with an intent to induce reliance because it made the above-referenced misrepresentations and omissions for the purpose of Plaintiff relying on them in purchasing a Delaware Life TruePath Income 10 ™ annuity.

119. Plaintiff justifiably relied on Delaware Life's misrepresentations, partial disclosures, and omissions because Plaintiff in fact purchased a Delaware Life TruePath Income 10 ™ annuity on terms he would not have agreed to but for Delaware Life's misrepresentations,

partial disclosures, and omissions. Indeed, but for Defendant's misrepresentations, partial disclosures, and omissions, Plaintiff would not have purchased the Delaware Life TruePath Income 10 ™ annuity; at minimum, he would not have agreed to purchase the annuity on the same terms.

120. Plaintiff suffered damages as a direct and proximate result of Delaware Life's misrepresentations, partial disclosures, and omissions in that Plaintiff paid more for his Delaware Life TruePath Income 10™ annuity than he would have had he known the truth (and the annuity he purchased was worth objectively less), accepted inferior terms than he would have had he known the truth, paid a substantial surrender fee on a prior annuity he used to exchange into the Delaware Life annuity, and became trapped in a new surrender charge period of a decade which Delaware Life has refused to waive. Members of the Classes all suffered the same or substantially similar damages.

121. Defendant's acts, as described herein, were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Classes' rights and well-being, and with the aim of enriching Defendant and its owner and affiliates. Defendant's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, and targeted at regular people, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, to be determined according to proof.

122. Plaintiff is entitled to actual damages, punitive damages, and rescission of the transaction to purchase a Delaware Life TruePath Income 10™ annuity.

## CLAIM II
**Negligent Misrepresentation**
**(On behalf of Plaintiff and the Classes Against Defendant)**

123. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

124. Plaintiff brings this count on behalf of himself and the members of the Classes.

125. As set forth above, Defendant made statements of fact that were incorrect and false.

126. Defendant affirmatively misrepresented its concentration of related-party investments when it filed its annual reports for 2024 and 2025, intentionally misclassifying those investments. Delaware Life also made misrepresentations regarding its financial strength and claims-paying ability, which were made directly to Plaintiff in the form of his illustrations (marketing materials provided to Plaintiff by Delaware Life), and through Delaware Life's brochure and marketing materials.

127. Further, Delaware Life made partial disclosures which triggered a duty to disclose. In its marketing materials, contracts, and other consumer-facing documents, Delaware Life emphasized its financial strength. For example, in the True Path Income™ brochure, Delaware Life states: "At Delaware Life, we provide insurance to protect what is often your second biggest asset—your retirement savings."[10] From the very beginning of the brochure, Delaware Life emphasizes that investing in its True Path Income™ annuity provides meaningful protection for retirement savings. The brochure continues with similar assurances, including that the "TruePath Income™ fixed index annuity is an insurance product that is designed to help you meet your long-term retirement needs[]" and that "TruePath Income™ also includes a built-in Guaranteed Lifetime Withdrawal Benefit (GLWB) rider, which guarantees you (or you and your spouse) will receive retirement income payments for life, even if the contract value drops to zero (provided certain conditions are met)." These promises emphasize long-term security and guaranteed income guaranteed by Delaware Life's assets (i.e. "even if the contract value drops to zero"). Similar representations are repeated throughout the brochure, for example: "If your

[10] https://www.delawarelife.com/product/truepath-income (last visited 11/4/26).

account value declines or reduces to zero, your income payments will continue for the remainder of your life or your life and your spouse's life if you elected joint life coverage."

128. In the same brochure, Delaware Life emphasizes its trustworthiness and the security of entrusting money to Delaware Life. For example, Delaware Life states: "Delaware Life has decades of annuity innovations and brings you a long history and solid track record. This includes developing competitive products, delivering a seamless, efficient experience, and serving as an honest and reliable financial institution." Delaware Life further emphasized its ratings from A.M. Best, S&P, and Fitch, stating to consumers: "Established in 1971, and rebranded as Delaware Life in 2013, we have a strong balance sheet and a highly talented and experienced employee base with the deep annuity and asset management expertise to proudly serve you and your clients and honor all the company's policyholder commitments."

129. Despite these representations, Delaware Life was secretly concentrating large portions of its assets into affiliated investments while misrepresenting the same to consumers.

130. Further, Delaware Life's marketing and contract materials tell purchasers that the guarantees they are buying depend on Delaware Life's financial strength and claims-paying ability, and its sales materials prominently display the financial strength ratings.

131. This is true in Plaintiff's case. In the illustrations provided by Delaware Life to Plaintiff, Delaware Life stated that the Company's "guarantees [. . .] are based on the claims-paying ability and financial strength of Delaware Life Insurance Company."

132. Delaware Life knew that its financial strength depended on the composition of its general account and that purchasers, distributors, and rating agencies would evaluate that composition through its statutory filings. Prior to June 2026, Delaware Life uniformly represented through regulatory filings that its exposure to its own controlling owner was small, when in fact it was not.

133. Delaware Life's various representations regarding its financial strength and claims-paying ability amounted to partial representations which triggered a duty to disclose. In short, Delaware Life chose to speak about its financial strength and claims-paying ability in public documents made available to Plaintiff and class members to encourage them to purchase an annuity from Delaware Life; as such, Defendant itself made its financial strength and claims-paying ability a central foundation of every annuity it sold (including to Plaintiff), and thereby assumed a duty to speak fully and truthfully regarding its related-party investments, which it failed to do.

134. Delaware Life also omitted material facts. For example, Delaware Life materially omitted its true concentration of related-party investments by failing to disclose the true concentration of the same in its regulatory filings or otherwise. Delaware Life had a duty to disclose these material omissions because of the nature of the relationship between Delaware Life and Plaintiff and class members, namely the trust placed by consumers in Delaware Life's representations (as recognized in New Jersey statutes as set forth in paragraphs 28-36, above). New Jersey recognizes a duty to disclose in "situations in which 'either one or each of the parties, in entering ... [the] transaction, expressly reposes ... a trust and confidence in the other ... or [because of the] circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence ... is necessarily implied.'" *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 551 (App. Div. 1997). Here, Delaware Life is not a public company subject to reporting requirements. Instead, its true condition is discernible to consumers only through statutory filings which, as set forth herein, contained material omissions. New Jersey and every other state recognizes this asymmetry of information, and that is why annuity providers are statutorily prohibited from publishing false or misleading information (*see*

paragraphs 28-36, above). Annuity purchasers like Plaintiff put their trust and confidence in providers such as Delaware Life making accurate disclosures, which Delaware Life failed to do.

135. Delaware Life's misrepresentations, partial disclosures, and omissions were material to Plaintiff and class members because had Plaintiff and class members known the truth regarding Delaware Life's affiliated investments, they would not have agreed to purchase the Delaware Life annuities; at minimum, they would not have agreed to purchase the annuities on the same terms. Further, that New Jersey and other states require annuity providers like Delaware Life to disclose related-party investments to regulators (and by extension consumers and the public) underscores the materiality of the misrepresentations, partial disclosures, and omissions at issue.

136. While Plaintiff alleges Defendant made the foregoing misrepresentations, partial disclosures, and omissions with knowledge that its respective misrepresentations, partial disclosures, and omissions were false, such statements and omissions were, at minimum, made negligently. Defendant knew its assets and the entities it was dealing with in investing those assets, knew its relationship to the parties it was dealing with, and therefore knew that it was materially misrepresenting its concentration of related-party investments, or was negligent in doing so. As set forth above, Delaware Life is controlled by Mark Walter and knew or should have known it was dealing with other Walter-adjacent entities in investing its assets.

137. Further, Delaware Life has a duty to Plaintiff and class members to disclose its financial state accurately, including its concentration of related-party investments, as recognized by law in New Jersey (and all other states). Delaware Life breached that duty because it was at least negligent in its misreporting of its related-party investments and its statements regarding its financial condition and claims paying ability.

138. Plaintiff suffered damages as a direct and proximate result of Delaware Life's misrepresentations, partial disclosures, and omissions in that Plaintiff would not have agreed to purchase the Delaware Life TruePath Income 10™ annuity (or at least would not have purchased it on the same terms) had he known the truth, his annuity was worth objectively less due to Defendant's misrepresentations and omissions, Plaintiff accepted inferior terms than he would have had he known the truth, paid a substantial surrender fee on a prior annuity he used to exchange into the Delaware Life annuity, and became trapped in a new surrender charge period of a decade which Delaware Life has refused to waive. Members of the Classes all suffered the same or substantially similar damages.

139. Defendant's acts, as described herein, were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Classes' rights and well-being, and with the aim of enriching Defendant and its owner and affiliates. Defendant's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, and targeted at regular people, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, to be determined according to proof.

140. Plaintiff is entitled to actual damages, punitive damages, and rescission of the transaction to purchase a Delaware Life TruePath Income 10™ annuity.

## CLAIM III
### Violation Of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*.
### (On behalf of Plaintiff and the New Jersey Subclass Against Defendant)

141. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

142. Plaintiff brings this count on behalf of himself and the members of the New Jersey Subclass.

143. The NJCFA states: "[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]" N.J.S.A. § 56:8-2. "Consumer fraud violations are divided broadly 'into three ... categories: affirmative acts, knowing omissions, and regulatory violations.'" *Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007) (quoting *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 17 (1994)).

144. In violation of the NJCFA, Defendant employed unconscionable commercial practices, deception, fraud, false pretense and/or false promise, and misrepresentation because Defendant affirmatively misrepresented its concentration of related-party investments when it filed its annual reports for 2024 and 2025, intentionally misclassifying those investments. Delaware Life also made misrepresentations regarding its financial strength and claims-paying ability, which were made directly to Plaintiff in the form of his illustrations (marketing materials provided to Plaintiff by Delaware Life), and through Delaware Life's brochure and marketing materials.

145. Further, Delaware Life made partial disclosures which triggered a duty to disclose. For example, in its marketing materials, contracts, and other consumer-facing documents, Delaware Life emphasizes its financial strength. For example, in the True Path Income™ brochure, Delaware Life states: "At Delaware Life, we provide insurance to protect

what is often your second biggest asset—your retirement savings."[11] From the very beginning of the brochure, Delaware Life emphasizes that investing in its True Path Income™ annuity provides meaningful protection for retirement savings. The brochure continues with similar assurances, including that the "TruePath Income™ fixed index annuity is an insurance product that is designed to help you meet your long-term retirement needs[]" and that "TruePath Income™ also includes a built-in Guaranteed Lifetime Withdrawal Benefit (GLWB) rider, which guarantees you (or you and your spouse) will receive retirement income payments for life, even if the contract value drops to zero[.]" These promises emphasize long-term security and guaranteed income guaranteed by Delaware Life's assets (i.e. "even if the contract value drops to zero"). Similar representations are repeated throughout the brochure, for example: "If your account value declines or reduces to zero, your income payments will continue for the remainder of your life or your life and your spouse's life if you elected joint life coverage."

146. In the same brochure, Delaware Life emphasizes its trustworthiness and the security of entrusting money to Delaware Life. For example, Delaware Life states: "Delaware Life has decades of annuity innovations and brings you a long history and solid track record. This includes developing competitive products, delivering a seamless, efficient experience, and serving as an honest and reliable financial institution." Delaware Life further emphasized its ratings from A.M. Best, S&P, and Fitch, stating to consumers: "Established in 1971, and rebranded as Delaware Life in 2013, we have a strong balance sheet and a highly talented and experienced employee base with the deep annuity and asset management expertise to proudly serve you and your clients and honor all the company's policyholder commitments."

147. Despite these representations, Delaware Life was secretly concentrating large portions of its assets into affiliated transactions while misrepresenting the same to consumers.

[11] https://www.delawarelife.com/product/truepath-income (last visited 11/4/26).

148. Further, Delaware Life's marketing and contract materials tell purchasers that the guarantees they are buying depend on Delaware Life's financial strength and claims-paying ability, and its sales materials prominently display its financial strength ratings.

149. This is true in Plaintiff's case. In the illustrations provided by Delaware Life to Plaintiff, Delaware Life stated that the Company's "guarantees [. . .] are based on the claims-paying ability and financial strength of Delaware Life Insurance Company."

150. Delaware Life knew that its financial strength depended on the composition of its general account and that purchasers, distributors, and rating agencies would evaluate that composition through its statutory filings. Prior to June 2026, Delaware Life uniformly represented through regulatory filings that its exposure to its own controlling owner was small, when in fact it was not.

151. Delaware Life's various representations regarding its financial strength and claims-paying ability amounted to partial representations which triggered a duty to disclose. In short, Delaware Life chose to speak about its financial strength and claims-paying ability in public documents made available to Plaintiff and class members to encourage them to purchase an annuity from Delaware Life; as such, Defendant itself made its financial strength and claims-paying ability a central foundation of every annuity it sold (including to Plaintiff), and thereby assumed a duty to speak fully and truthfully regarding its related-party investments, which it failed to do.

152. Delaware Life also knowingly omitted and concealed material facts. For example, Delaware Life materially omitted and concealed its true concentration of related-party investments by failing to disclose the true concentration of related-party investments, whether in regulatory filings or otherwise, as set forth herein. Knowing omissions are actionable under the NJCFA.

153. The NJCFA provides a remedy to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act[.]" N.J.S.A. § 56:8-19.

154. Here, Plaintiff suffered an ascertainable loss. First, he was denied the benefit of the bargain because Plaintiff paid a price in the form of the premium set for a long-term unsecured promise backed by an asset portfolio represented to be approximately 97% independent (i.e. non-affiliated). Plaintiff in fact received a promise backed by a portfolio of which approximately 42% of the assets were largely illiquid and dependent on the success of a single, related party (*i.e.* the Walter business empire). At the same time, Delaware Life's capital and surplus was approximately $4.0 billion, far less than the amount of the related-party investments. Plaintiff did not bargain for such a credit risk, which was worth less than the premium paid by Plaintiff. The difference in value between what Plaintiff paid for and what he received is an ascertainable loss that is measurable by ordinary credit-valuation methods.

155. Plaintiff suffered damages as a direct and proximate result of Delaware Life's misrepresentations, partial disclosures, and omissions in that Plaintiff paid more for his Delaware Life TruePath Income 10™ annuity than he would have had he known the truth, accepted inferior terms than he would have had he known the truth, paid a substantial surrender fee on a prior annuity he used to exchange into the Delaware Life annuity, and became trapped in a new surrender charge period of a decade which Delaware Life has refused to waive. Members of the Classes all suffered the same or substantially similar damages.

156. There is a causal relationship between Defendant's unlawful conduct and Plaintiff's ascertainable losses. Defendant's unlawful conduct as described herein caused Plaintiff to pay a substantially higher premium and be deprived of the benefit of his bargain because Defendant knowingly misrepresented and concealed the true concentration of related-

party investments which resulted in Plaintiff paying a higher premium than he should have given the actual credit risk.

157. As a result of Defendant's fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, Plaintiff and the New Jersey Subclass are entitled to actual damages, treble damages, costs, filing fees, attorneys' fees, and other damages to be determined at trial. *See* N.J.S.A. § 56:8-19.

## CLAIM IV
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On behalf of Plaintiff and the Classes Against Defendant)**

158. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

159. Plaintiff brings this count on behalf of himself and the members of the Classes.

160. "Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205.

161. Good faith and fair dealing "means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Noto v. Skylands Cmty. Bank*, 2005 WL 2362491, at *6 (N.J. App. Div. 2005). "A duty of good faith and fair dealing is implicit in every contract of insurance, and the insurer has an even greater duty than the insured to act fairly and in good faith." *Edwards v. Prudential Prop. & Cas. Co.*, 357 N.J. Super. 196, 203 (App. Div. 2003). Annuity contracts are insurance contracts.

162. Delaware Life and Plaintiff entered into a contract regarding Plaintiff's purchase of a Delaware Life TruePath Income 10™ annuity.

163. Delaware Life breached the implied covenant of good faith and fair dealing by administering annuity contracts (including with Plaintiff), for which its core promise was Delaware Life's financial strength, while Delaware Life knowingly concealed and

misrepresented the related-party investments backing the contracts, and by penalizing Plaintiff and class members by enforcing the surrender charges and Market Value Adjustments when Plaintiff and class members sought to exit their contracts after discovering the truth.

164. Plaintiff's TruePath Income 10™ annuity, and the Classes' annuities, contain a 10-year surrender charge schedule (starting at 10% in year 1 and declining to 1% in year 10), in addition to a Market Value Adjustment, which actively impedes Plaintiff's and the Classes' ability to exit the annuity contracts which were entered into on false pretenses.

165. Defendant's actions had the effect of injuring the rights of Plaintiff and the Classes to receive the fruits of the contract because they ended up paying higher premiums than they should have given the level of risk (in the form of related-party investments), and Delaware Life not only lured them in but shut the door behind them in the form of high surrender charges and fees which Delaware Life now refuses to waive.

166. Plaintiff and members of the Classes were damaged as a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing because they are required to pay surrender charges and Market Value Adjustments to Defendant as a condition of rescinding the transactions which, under the circumstances, constitutes bad faith by Defendant.

167. Plaintiff and members of the Classes performed all conditions required of them under their contracts with Delaware Life.

## CLAIM V
## Fraud in the Inducement
## (On behalf of Plaintiff and the Classes Against Defendant)

168. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

169. Plaintiff brings this count on behalf of himself and the members of the Classes.

170. Delaware Life made fraudulent misrepresentations, partial representations triggering a duty to disclose, and material omissions as set forth above. Delaware Life did so for the

purpose of inducing Plaintiff (and class members) to enter into a contract with Delaware Life for the purchase of a Delaware Life TruePath Income 10™ annuity (and other annuities relevant to the class).

171. Through its fraudulent misrepresentations, partial representations triggering a duty to disclose, and material omissions as set forth above, Delaware Life in fact induced Plaintiff (and class members) to enter into a contract with Delaware Life for the purchase of a Delaware Life TruePath Income 10™ annuity (and other annuities relevant to the class). In other words, Plaintiff and class members reasonably relied on Defendant's fraudulent misrepresentations, partial representations triggering a duty to disclose, and material omissions.

172. As set forth above, Defendant knew that its fraudulent misrepresentations, partial representations triggering a duty to disclose, and material omissions were false, and made them with the intent that Plaintiff and class members would rely on them in the form of purchasing annuity contracts from Delaware Life (which they did).

173. Plaintiff suffered damages as a direct and proximate result of Delaware Life's misrepresentations, partial disclosures, and omissions in that Plaintiff paid more for his Delaware Life TruePath Income 10™ annuity than he would have had he known the truth, accepted inferior terms than he would have had he known the truth, paid a substantial surrender fee on a prior annuity he used to exchange into the Delaware Life annuity, and became trapped in a new surrender charge period of a decade which Delaware Life has refused to waive. Members of the Classes all suffered the same or substantially similar damages.

174. Defendant's acts, as described herein, were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Classes' rights and well-being, and with the aim of enriching Defendant and its owner and affiliates. Defendant's conduct, which exhibits the highest degree of reprehensibility, being intentional,

continuous, and targeted at regular people, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

175. Plaintiff is entitled to actual damages, punitive damages, and rescission of the transaction to purchase a Delaware Life TruePath Income 10™ annuity.

**<u>CLAIM VI</u>**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Classes Against Defendant)**

176. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

177. Plaintiff brings this count on behalf of himself and the members of the Classes.

178. Plaintiff and class members conferred a benefit on Defendant in the form of premiums paid for annuity products, including Plaintiff's purchase of the Delaware Life TruePath Income 10™ annuity

179. Delaware Life appreciated the benefits by realizing the money paid by Plaintiff and class members for their premiums related to the Delaware Life annuities at issue.

180. Defendant's acceptance and retention of such benefits were under circumstances that it would be inequitable for Defendant to retain the benefit because the benefits were obtained by misrepresenting and/or concealing from Plaintiff and class members the related-party investments that backed Delaware Life's promises which, if known, would have caused Plaintiff and class members to decline to proceed with the transaction or, at minimum, proceed with the transaction on materially different (and more favorable) terms.

181. As a result of Defendants' unjust enrichment, Plaintiff and class members are entitled to restitution of their premiums and any surrender charges, Market Value Adjustments, fees, and

other benefits unjustly obtained and retained by Defendants. Plaintiff and class members are also entitled to rescission of their annuity contracts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the Classes, that the Court enter judgment in his favor and against Defendant as follows:

A. An Order certifying each of the proposed Classes and appointing Plaintiff and his Counsel to represent the Classes;

B. An Order declaring that Defendant is liable for each of the causes of action set forth herein;

C. An Order of restitution, disgorgement of wrongfully obtained profits;

D. An Order rescinding Plaintiff's and the Classes' annuity contracts with Delaware Life;

E. An award of compensatory damages, statutory damages (including trebled damages under the NJCFA), and punitive damages, in an amount to be determined;

F. An award of reasonable attorneys' fees, costs, filing fees, and litigation expenses, as allowable by law;

G. Interest on all amounts awarded, as allowed by law; and

H. Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands, for himself and the Classes, a trial by jury of all issues so triable.

Dated: November 17, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Andrew J. Obergfell*
Andrew J. Obergfell

Joseph I. Marchese*
Andrew J. Obergfell
1330 Avenue of the Americas
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jmarchese@bursor.com
aobergfell@bursor.com

*Attorneys for Plaintiff*

**pro hac vice* forthcoming